# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| THOMAS HARLAN, | |
| Plaintiff, | Civil No. 16-00077 (RBK/KMW) |
| v. | **OPINION** |
| PACKAGING CORPORATION OF AMERICA, | |
| Defendant. | |

**KUGLER**, United States District Judge:

Plaintiff Thomas Harlan brings claims of breach of contract and unjust enrichment against Defendant Packaging Corporation of America ("PCA") under New Jersey law. This matter comes before the Court upon Defendant's Motion for Summary Judgment ("Def. Br.") (Doc. No. 22), Plaintiff's Brief in Opposition thereto ("Pl. Opp'n") (Doc. No. 23), and Defendant's Reply in Support thereof ("Def. Reply") (Doc. No. 24). For the reasons that follow, Defendant's motion is **GRANTED**.

## I. FACTUAL BACKGROUND

### A. PCA's Hiring of Plaintiff

PCA is a corporation involved in the trade and marketing of packaging, transportation, and display products, such as corrugated boxes. Defendant's Statement of Undisputed Material Facts ("Def. St.") (Doc. No. 22-2) at ¶ 1; Plaintiff's Responsive Statement of Material Facts

1

("Pl. Resp.") (Doc. No. 23-2) at ¶ 1. One of PCA's internal departments is the National Accounts Graphics group, supervised by Thomas Hastings, Director of National Graphic Packaging and Display. Def. St. at ¶ 2. Mr. Hastings reports to Thomas Walton, PCA's Senior Vice President of Sales and Marketing. *Id.*

Around May 13, 2011, Plaintiff Thomas Harlan began talking to Mr. Hastings, Mr. Walton, and other individuals at PCA about a National Sales Manager position at the company. Pl. Resp. at ¶¶ 2-4. During these conversations, Plaintiff discussed the terms of his potential employment. Pl. Resp. at ¶ 4. On the basis of these conversations, Plaintiff was "led to believe that the opportunity would be [at PCA] to work well into my 70s." Pl. Opp'n, Ex. D, at 192:15-193:18. Plaintiff, who was 60 years old at the time, states that "it was expressed to me that at 65, you didn't have to go away, you know. It wasn't like you hit 66, and it was over. They said it was a company that welcomed people working into their older senior years." *Id.* Another employee of PCA, Tom Yap, Vice President of National Brown Box Accounts, similarly assured Plaintiff that his age would not be an issue with regard to employment at the company. Pl. Supp. at ¶ 12.

During the interview process, Plaintiff showed Mr. Hastings a competing, salaried offer from International Paper ("IP") for $400,000 and 10,000 in restricted shares of IP stock. Pl. Resp. at ¶ 12. Plaintiff claims that Mr. Hastings "set the expectation" that PCA's compensation would meet or exceed the IP offer. *Id.* Plaintiff also maintains that Mr. Hastings stated it "couldn't meet the offer initially but could 'exceed it in the future' and provided verbal assurance that PCA 'could get to the $400,000 number.'" *Id.*; Pl. Supp. at ¶¶ 6-8. Plaintiff ultimately turned down the IP job and went with PCA instead. Pl. Supp. at ¶ 14.

2

At the close of these discussions, Mr. Hastings sent to Plaintiff an offer letter on June 24, 2011 for a position as a National Sales Manager in PCA's National Accounts Graphic Group. Def. St. at ¶ 6. The terms of the offer were a monthly salary of $17,083.33, annualized at $205,000. Def. Br., Ex. E. The offer letters provided for a 2012 bonus of $35,000 and a 2013 bonus of $75,000, "payable in conjunction with our Bonus Compensation Plan and contingent on continued PCA employment." *Id.* It also states "this letter is not a contract or guarantee of employment," and that the offer and acceptance were both contingent on the passing of a drug test pursuant to PCA hiring practices. *Id.* Plaintiff signed and accepted PCA's offer of employment, and the offer letter is dated June 30. Pl. Resp. at ¶ 6. Plaintiff maintains that despite the offer letter's terms, he believed that the written offer letter was a "formality," and he was accepting a "verbal agreement" based upon his trust of Mr. Hastings. Pl. Supp. at ¶ 15.

Plaintiff signed other documents prior to beginning employment at PCA. On June 28, 2011, Plaintiff completed and signed a document titled "PCA Employment Application." Pl. Resp. at ¶ 8. That agreement states, in part, that "any employment relationship with this organization is of an '*at will*' nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without notice and with or without cause. It is further understood that this '*at will*' employment may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization." Def. Br., Ex. A (emphasis in original). The same application also states that "PCA shall not be liable for any wages, salary or other benefits other than those earned prior to the termination of [the employee's] employment." *Id.*

That same day, Plaintiff also signed a document titled "Employment Agreement on Inventions, Improvements and Discoveries, and Proprietary Information and the Employment

Relationship." Pl. Resp. at ¶ 8. This agreement stated, among other things, that Plaintiff agreed to work as an at-will employee: "IT IS FURTHER AGREED AND UNDERSTOOD THAT THIS AGREEMENT IS NOT A CONTRACT OF EMPLOYMENT AND THAT EMPLOYEE IS EMPLOYED AT-WILL. This means that employment is subject to termination, at the option of the Employee or the Company, at any time, with or without prior notice or warning, and with or without just cause." Def. Br., Ex. G.

### B. Plaintiff's Performance and Termination

Plaintiff began working for PCA on approximately July 1, 2011. Pl. Resp. at ¶ 14. The parties dispute the precise scope of Plaintiff's duties at PCA, though both agree that part of his job was to "grow sales." Pl. Resp. at ¶ 15. The parties likewise disagree on what the actual sales goals were, including whether there were written goals, though they agree Plaintiff and Mr. Hastings orally discussed general sales goals and communicated weekly. Pl. Resp. at ¶¶ 16-17. Mr. Hastings was unable to recall what those goals were in his deposition. *Id.* Plaintiff was unaware of any written job description when he was hired, and has also presented evidence that another hire, Mr. Muniz, was similarly unaware of a written job description. Pl. Supp. at ¶ 9.

At the onset of Plaintiff's employment in August of 2011, he presented a list of nineteen prospects he and his team would target to generate business for PCA. Def. St. at ¶ 18. Of these, approximately one quarter of the prospects became PCA customers during Plaintiff's time at PCA. *Id.* at ¶ 19. Plaintiff argues further that he brought in additional accounts beyond those in the August list of prospects. Pl. Resp. at ¶ 21. Two of the accounts brought in by Plaintiff were considered "small accounts" that brought in less than $100,000 in sales. Def. St. at ¶ 19. Plaintiff brought in an account from Merck that generated $50,000 in initial sales, and he claims the

4

account ultimately brought in $2,500,000 by the time of Plaintiff's termination, qualifying as a "large account" at PCA. Pl. Resp. at ¶ 20. All told, the sum of all accounts brought in by Plaintiff is disputed by the parties: PCA argues they were of low value and that Plaintiff "sold very little," while Plaintiff asserts he generated more than $37,000,000 in sales. Def. St. at ¶ 21; Pl. Resp. at ¶ 21.

During the years of Plaintiff's employment, Mr. Hastings, Plaintiff's supervisor, received performance complaints from multiple employees stating Plaintiff was not trustworthy and was not a "team player." Pl. Resp. at ¶ 22. Plaintiff disputes the factual validity of these complaints, though he concedes the complaints occurred. Pl. Resp. at ¶ 22. One complaint was from a coworker who Plaintiff argues was in competition with Plaintiff over the Merck account; another complaint was from design staff who apparently did not believe that Plaintiff's design requests were real. Pl. Resp. at ¶ 22. Furthermore, when Plaintiff's 2013 performance was up for review for bonuses in the first quarter of 2014, his superior, Mr. Walton, noted that Plaintiff was "[n]ot meeting expectations" and so a "[s]ignificant reduction [was] appropriate" from the prior years. Def. St. at ¶ 27.

Plaintiff maintains PCA neither gave him a performance review nor gave any indication that his performance was lacking. Pl. Supp. at ¶ 21. PCA, for its part, has offered evidence that in December of 2014, Plaintiff received a customer email from Ronald Elowitz, Samsung's Director of In-Store Merchandising & Operations, calling PCA's performance on its Samsung account an "epic failure" because it apparently went over budget. Def. Reply, Ex. F. Plaintiff responded by taking responsibility for this, stating "the blame resides with me" and "I've been doing this for too long to make this mistake." Def. Resp. at ¶ 22. Plaintiff also concedes that the

team he was managing was in "conflict" with another PCA team over the Merck account. Pl. Supp. at ¶ 24.

This pattern of complaints culminated in an April 27 meeting between Mr. Hastings and Plaintiff. *Id.* at ¶ 28. The parties dispute what happened in the meeting; Plaintiff says he was told he would be terminated without any reason offered as explanation, while PCA states Plaintiff was told his performance was unsatisfactory. Pl. Resp. at ¶ 28. Plaintiff was asked to sign a document titled "Separation Agreement and General Release" with the effect of terminating his employment at PCA. *Id.* Plaintiff refused to sign it, and soon after was fired. Def. St. at ¶ 28; Pl. Resp. at ¶ 29. Plaintiff's last official day of employment with PCA was May 31, 2015. Def. St. at ¶ 29. Documents submitted to the Court indicate the stated reason for termination was unsatisfactory performance. Pl. Br., Ex. M.

### C. Plaintiff's Bonuses

Incentive compensation in this case has occasioned its own controversy. During the interview process, Mr. Hastings and Plaintiff discussed bonuses, and the agreement for these bonuses was memorialized in the offer letter sent to Plaintiff. Def. Br., Ex. E. PCA generally issues employee bonuses pursuant to its General Management Incentive Plan (GMIP), and Plaintiff agrees that the GMIP is the same "Bonus Compensation Plan" mentioned in the offer letter he received. Pl. Resp. at ¶¶ 11, 26; Pl. Opp'n, Ex. E. Although the parties dispute the application of the text of the GMIP policy, its language is straightforward.[1] The GMIP sets forth a multifactor guide for whether PCA will give a bonus to an employee, evaluating a set of

---

[1] The Court reminds Plaintiff that under Local Civil Rule 56.1, a Statement of Disputed Material Facts must present the facts, not argue over their import. The text of the GMIP is a factual matter for the Statement of Disputed Material Facts; interpretation of that text is a legal matter for briefing. *See, e.g., Durkin v. Wabash National*, 2013 U.S. Dist. LEXIS 44467 (D.N.J. Mar. 28, 2013) ("The Rule 56.1 statement should only identify the universe of uncontested facts before the Court; arguments as to the force of those facts belongs in the brief.").

qualitative and quantitative factors. *Id.* For a Sales Manager, Plaintiff's former position at PCA, the GMIP states the maximum achievable bonus for a given year is 32% of base salary. *Id.* The GMIP also has an "override provision" that may alter that percentage depending on company performance, division performance, and other significant considerations. *Id.* This provision may either add or subtract up to 20% from the base bonus, *i.e.* raise the amount to 52% or decrease it to 10%. *Id.* The GMIP is silent on whether it obliges PCA to pay bonuses.

There is some disagreement about what, precisely, Plaintiff believed his bonus would be after 2013. Plaintiff states he was told during the interview process "[t]here would be bonuses based on corporate" in the years following 2013, and he appears not to have been aware of the GMIP policy while working there. Pl. Resp. at ¶ 24. Plaintiff furthermore seems to have believed that the compensation level of $400,000 and benefits contained in the IP offer he declined would be met by means of bonuses accruing across "several years" of work at PCA. *Id.* at ¶ 25. This did not occur, and instead Plaintiff's bonuses decreased in subsequent years. Mr. Walton noted in 2015 that Plaintiff was not meeting expectations, and PCA gave $21,328 as a bonus for that year. *Id.* Plaintiff received no bonus at all for the months of 2015 that he worked prior to his termination.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Id.*

at 248. Because fact and credibility determinations are for the finder of fact, the non-moving party's evidence is to be believed and ambiguities construed in its favor. *Id.* at 255.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Id.* at 256. The nonmoving party must at least present probative evidence from which a finder of fact would be able to return a verdict in his favor. *Id.* at 257. Furthermore, the nonmoving may not simply allege facts, but instead must "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002). The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

Plaintiff has asserted two separate theories of recovery in this action. He first argues PCA breached its contract for continued employment, and also asserts a separate breach of contract for payment of bonuses. In addition, Plaintiff argues for recovery under a theory of unjust enrichment. None is viable as a matter of law.

#### A. Breach of Contract Claims

##### 1. Plaintiff Was an At-Will Employee and PCA Acted Within Its Rights to End the Employment Relationship

In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine. *Russelman v. ExxonMobil Corp.*, 2012 WL 3038589, at *3 (D.N.J. July 25, 2012) (Kugler, J.) (citing *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 396 (N.J. 1994) (internal citations omitted)). New Jersey is a presumptively at-will

state, and an employment relationship is considered terminable at the option of either employee or employer. *Woolley v. Hoffman-La Roche, Inc.*, 491 A.2d 1257, 1258 (1985); *see also Bernard v. IMI Sys., Inc.*, 131 N.J. 91, 106, (1993) ("in today's volatile employment market, it is both uncommon and unreasonable to expect employment for one year simply because an offer letter quotes an annual salary").

At-will status may be modified by oral promises of the employer. *Mita v. Chubb Computer Services, Inc.*, 337 N.J. Super. 517, 525-26 (App. Div. 2001). "[O]ral assurances of job security may be enforceable by an employee where the terms and conditions of employment are clear and capable of judicial interpretation and an employee reasonably relies on them to his/her detriment." *Swider v. Ha-Lo Indus., Inc.*, 134 F. Supp. 2d 607, 617 (D.N.J. 2001) (citing *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 284 (1988)). However, "not every relinquishment of a prior job or job offer constitutes additional compensation to support the modification of an at-will employment into employment with termination for cause only." *Id.* at 289-90. There must be consideration for this modification, because otherwise "the length of an 'at will' employee's engagement is not controlled by contract." *Nolan v. Control Data Corp.*, 243 N.J. Super 420, 429 (App. Div. 1990); *see also Shebar*, 111 N.J. at 282-89 (finding a bargained-for exchange that modified at-will status where Plaintiff proposed to resign in favor of a new position and was orally promised life employment that caused him to remain at his job); *Peck v. Imedia*, 293 N.J. Super. 151, 154 (App. Div. 1996) (finding no bargained-for exchange that modified at-will status where plaintiff relocated to a different city for a new position but was fired before commencing)

Plaintiff has called into question whether there is a contract that defines the relationship between the parties. There appears to be no employment contract as such between the parties, only a set of documents speaking to compensation and at-will status. As set out above, these

9

documents, taken on their own terms, indicate Plaintiff not only consciously entered into an employment relationship with PCA as an at-will employee, but had entered into a contract with the company. "It is elementary that the assertion of a contract implied in fact calls for the establishment of a consensual understanding as to compensation or reimbursement inferable from the circumstances under which one furnishes services or property and another accepts such advances." *Deskovick v. Porzio*, 78 N.J. Super. 82, 86–87 (App. Div. 1963). Plaintiff agreed he was at-will when he signed these and he agreed to the compensation arrangement when he signed the offer letter. *See Hanisko v. Billy Casper Golf Mgmt., Inc.*, 437 N.J. Super. 349, 362 (App. Div. 2014) (finding an offer letter to be a written contract where setting forth the material terms of an employment agreement, including compensation). While the documents are not integrated as to all terms of employment, they clearly cover disputes over compensation and continued employment at issue in this case.[2] The Court thus finds that the parties had, at a minimum, an implied-in-fact contract governing issues of compensation and continued employment.

Plaintiff thus turns to oral representations of continued employment made to him before hiring and argues these modified the contract between him and PCA. His argument distills to a claim that PCA orally promised either employment terminable for cause or lifetime employment. Plaintiff claims he had received a competing offer of $400,000 with stock options, and that Mr. Hastings "set the expectation" that PCA's compensation would meet or exceed this offer. According to Plaintiff, Mr. Hastings said that PCA could not initially meet the offer, but it could exceed it in the future. Pl. Resp. at ¶ 12; Pl. Supp. at ¶¶ 6-8. Taken together with comments made to him that he could work into his seventies, Plaintiff claims this establishes that he was entitled

---

[2] Indeed, even in the absence of these documents, a presumption of at-will employment would still control under New Jersey law, and Plaintiff has provided no evidence to indicate otherwise. *Woolley*, 491 A.2d at 1258.

to employment until he was at least 71, on the assumption that he would receive salary and bonus raises each year until reaching the same offer from IP.

By his own admission, Plaintiff only had the opportunity to work at PCA into his seventies. Merely turning down a job in favor of another does not itself create a contract for continued employment—there must be consideration. *Shebar,* 111 N.J. at 289-90. Plaintiff concedes he was told PCA would not offer him the amount the competing offer provided, but maintains nonetheless that they told him some day his compensation may reach that level. A decision to decline one job on the basis of such language is not a bargained-for exchange, and does not make out a contract whose terms are "clear and capable of judicial interpretation." *Shebar*, 111 N.J. at 290. *See also Fregara v. Jet Aviation Bus. Jets*, 764 F. Supp. 940, 947 (D.N.J. 1991) ("[Plaintiff's] 'impression' that he had an oral contract providing for job security, completely unsupported by the record, does not provide a basis for avoiding summary judgment.").

Even assuming arguendo that there was the oral contract that Plaintiff claims, Plaintiff went on to sign the offer letter and other documents whose explicit terms conflict with the alleged oral arrangement. This is fatal to his argument, for "a subsequent contract covering the same subject matter and made by the same parties, but containing terms inconsistent with the former contract so that the two cannot stand together, *rescinds, supersedes and substitutes for the earlier contract* and becomes the only agreement on the part of the parties on the subject matter." *Rosenberg v. D. Kaltman & Co.*, 28 N.J. Super. 459, 463–64, 101 A.2d 94, 96 (Ch. Div. 1953) (emphasis added). The written offer letter supersedes preceding oral discussions for issues of compensation. Plaintiff signed this before beginning work and PCA performed its compensation terms. Plaintiff argues that there were additional terms, but those are inconsistent with the

11

agreement he entered into and thus are not binding on PCA. As such, the offer letter takes priority over any agreement that came before it, at least as concerns compensation and at-will status. Since Plaintiff has offered no evidence subsequent to these documents that could provide a basis for finding the contract he entered into does not control, the Court finds Plaintiff worked at-will and that PCA had the right to terminate his employment. The claim is dismissed.

2. <u>Plaintiff is Not Entitled to Payment for Bonuses or Additional Compensation Due at the Time of His Termination</u>

Plaintiff makes another argument: at-will employee or not, he was entitled to bonuses. Plaintiff argues, first, that he is entitled to the difference between what he actually earned while employed at PCA and what he was promised and, second, that he was denied bonus funds that he had earned during the first five months of 2015. Compl. at ¶¶ 11-18; Pl. Opp'n at 4. Plaintiff argues (where he should not) in his Supplemental Statement of Material Facts that he was entitled to bonuses of 52% of his base salary as high as $140,489. Pl. Supp. at ¶ 13. Plaintiff states he was not aware of the bonus policy at PCA, and that another hire, Mr. Muniz, was similarly unaware of a written job description when he came on to PCA. Pl. Supp. at ¶¶ 9, 24. But Plaintiff *did* have notice; he concedes he was told at hiring that "[t]here would be bonuses based on corporate," Pl. Resp. at ¶ 24, and the offer letter sent to Plaintiff also clearly indicates the existence of a bonus policy at PCA. Indeed, Plaintiff agrees the GMIP is the same "Bonus Compensation Plan" mentioned in the offer letter he received. Since both parties agree that the bonus policy controls here, the Court looks to the bonus policy to determine whether Plaintiff's arguments have merit. They do not.

Plaintiff's first argument, that he is entitled to the difference between what he received and what he claims he was promised, is unconvincing. As held above, the Court has already found there was a contract between the parties on the issue of compensation. Although Plaintiff

has offered voluminous information about his performance and how that entitles him to larger bonuses, such information is immaterial: Plaintiff entered into an agreement about his bonuses, and that agreement controls. This argument fails.

The second argument, concerning those few months of 2015 performance bonuses, lacks merit. The GMIP, PCA's policy, sets forth a multifactor analysis for determining bonuses. It states that the *maximum* achievable payout Plaintiff could have received for a given year is 32% of base salary, with a potential for 20% more (or less) based on overall company performance. The GMIP is silent on whether such payouts are mandatory, so the Court must interpret the document by reference to the standard of reasonable expectations. *See Woolley*, 99 N.J. at 297–98 (*"*when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment . . . the judiciary . . . should construe them in accordance with the reasonable expectations of the employees"); *cf.* 11 Williston on Contracts § 31:11 (4th ed.) ("With respect to oral and other informal agreements—those agreements as to which there is no integrated writing—the standard of interpretation . . . is the standard of reasonable expectation."). The plain meaning of the policy is that it provides a ceiling—but not a floor—for the distribution of bonuses pursuant to PCA discretion. Employees may have a reasonable expectation of a bonus for good performance. But few would reasonably expect a bonus policy that makes bonuses mandatory, let alone mandatory when an employer is unsatisfied with an employee's performance. While Plaintiff disputes that PCA had the discretion to award bonuses, he was an at-will employee of PCA, and Plaintiff simply has not offered evidence suggesting anything to the contrary. Per the GMIP, PCA could give between 52% of salary or nothing for 2015's performance—and so it follows that PCA was within its rights to give Plaintiff no bonus for the months he worked before his termination in 2015.

### B. Unjust Enrichment

Plaintiff also brings a claim of unjust enrichment against PCA, alleging that Plaintiff failed to receive compensation and bonuses commensurate with the $37,000,000 of sales he claims he brought in before his termination. In New Jersey, a cause of action for unjust enrichment requires proof that defendants received a benefit and that retention of that benefit would be unjust. *Goldsmith v. Camden Cnty. Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009). Unjust enrichment, also known as "quasi-contract," is inapplicable where there is an express contract between the parties. "Quasi-contract liability will not be imposed . . . if an express contract exists concerning the identical subject matter. The parties are bound by their agreement, and there is no ground for implying a promise as long as a valid unrescinded contract governs the rights of the parties." *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir. 1983). Importantly for purposes of this litigation, "an implied-in-fact contract is in legal effect an express contract." *St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am.*, 32 N.J. 17, 23 (1960).

As previously discussed, the parties have an express contract between them that governs the terms of Plaintiff's employment. The offer letter sets forth the relevant agreement for compensation, and incorporates by reference the bonus policy, a fact Plaintiff concedes. Yet even if the written agreement between the parties did not specifically set the compensation level, Plaintiff has failed to show PCA has unjustly retained a benefit. Plaintiff asserts he was responsible for $37,000,000 in sales, but fails to provide an explanation for what difference that would make with regard to an at-will employee's bonuses. It is not the place of this Court to second-guess PCA's personnel decisions for at-will employees in the absence of discrimination. *Chapman v. Am. Inst. Of Certified Pub. Accountants*, 2005 WL 2620191, at *3 (D.N.J. Oct. 13,

2005). As such, the Court finds that Plaintiff's unjust enrichment claim fails as a matter of law. It too is dismissed.

## IV. CONCLUSION

For the reasons stated herein, Defendant PCA's motion for summary judgment is **GRANTED**. An appropriate order shall issue.


Dated: 09/05/2017                                                      s/Robert B. Kugler
                                                                                      ROBERT B. KUGLER
                                                                                      United States District Judge